FILED

JAN 0 6 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | I N F O R M A T I O N |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. **1:23 CR 011** |
| v. ) | |
| ) | Title 18, United States Code, |
| TERRENCE ANDERSON, ) | Section 1343 |
| ) | |
| Defendant. ) | **JUDGE NUGENT** |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

1. Defendant TERRENCE ANDERSON was a resident of Parkland, Florida. Defendant worked in the polymer industry, buying and reselling polymers, including polyethylene.

2. Coral Polymers was a corporation owned and operated by Defendant in Parkland, Florida, for the purpose of buying and reselling polymers.

3. Victim Seller 8 was headquartered in Avon Lake, Ohio. Victim Seller 8 was involved in the sale of polymers, including polyethylene, throughout the world. Victim Seller 8 maintained its email servers in the Northern District of Ohio, Eastern Division.

4. Victim Logistics Company 2 was a logistics company located in Streator, Illinois. Victim Logistics Company 2 repackaged product received by way of railcar into gaylord boxes, which were large boxes on pallets that were used to ship items in bulk, for the purpose of enabling the product to be loaded and transported by way of a semi-trailer truck.

5. Conspirator 1 was the owner of Entity 1, a trucking business located in Cades, South Carolina, which operated semi-trailer trucks for transporting products for clients.

6. Person 1 and Person 2 were truck drivers employed by Entity 1.

## COUNTS 1 – 5
(Wire Fraud, 18 U.S.C. § 1343)

The First Assistant United States Attorney charges:

7. The allegations contained in paragraphs 1 through 6 of this Information are incorporated by reference as if stated fully herein.

### The Scheme to Defraud

8. From in or around June 2013 to January 2020, in the Northern District of Ohio, Eastern Division, and elsewhere, the Northern District of Ohio, Eastern Division, and elsewhere, Defendant TERRENCE ANDERSON, with the intent to defraud, did devise, and intend to devise, a scheme and artifice to defraud, and to obtain property from various companies involved in the sale of polymers, including polyethylene, and companies engaged in the business of packaging polyethylene from railcars, by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, by obtaining polymer products and logistics services by fraud, by posing as fictional representatives of known companies in order to obtain shipments and services without making advanced payment, never intending to make the promised payments.

### Manner and Means of the Scheme

9. The manner and means by which Defendant carried out the scheme included, but were not limited to, the following:

    a. Defendant posed as fictional employees of large, well-known corporations by creating and using email addresses that were similar to those of corporations known to

purchase polymers (the "Fraudulent Addresses"), using email signatures falsely claiming to be employed by those corporations, and using the known logos and purported letterhead of those corporations.

   b.  Defendant used the Fraudulent Addresses to contact victim sellers of polymers to agree to purchase large quantities of polymers through interstate wire transmissions, to be delivered by railcars to victim logistics companies at particular locations (the "Stolen Shipments"). Defendant submitted purchase orders for Stolen Shipments worth at least approximately $4,855,312 from at least eight victims. Defendant, through individuals acting at his direction, received Stolen Shipments worth at least approximately $3,741,787 from at least six of those victim sellers.

   c.  Defendant used the Fraudulent Addresses to contact victim logistics companies to arrange for those victims to provide logistics services in connection with Stolen Shipments, including to unload bulk polyethylene pellets from railcars, repackage the polyethylene in gaylord boxes, temporarily store the polyethylene, and load the repackaged polyethene into the trailers of semi-trailer trucks. Defendant obtained logistics services for two of the Stolen Shipments worth at least $87,416.61.

   d.  Defendant arranged for Conspirator 1 and others to have employees of Entity 1, driving semi-trailer trucks controlled by Conspirator 1 and Entity 1, pick up the Stolen Shipments, including from victim logistics companies, in exchange for fees paid to Entity 1.

   e.  Defendant directed Conspirator 1 and drivers for Entity 1 to conceal the identity of Entity 1 and the drivers when picking up the Stolen Shipments, including by directing Conspirator 1 to ensure that license plates of the trucks being used were removed or covered and to use false names for both Entity 1 and the driver.

3

f.  If a victim company requested identification from the driver, or if Defendant expected that might occur, Defendant also provided a copy of a counterfeit driver's license, using a false name for the driver and false biographical information.

g.  Defendant, using the name of his company, Coral Polymers, found third-party buyers who were unaware of the origin of the Stolen Shipments, and arranged to sell the Stolen Shipments to the buyers for substantial sums of money.

h.  Defendant arranged for Conspirator 1 and others to have employees of Entity 1, driving semi-trailer trucks controlled by Conspirator 1 and Entity 1, to deliver the Stolen Shipments to buyers, using the true names of Entity 1 and its drivers, in exchange for fees paid to Conspirator 1 or Entity 1.

i.  Defendant directed Conspirator 1 and drivers for Entity 1 to conceal the true plans for the destination of the Stolen Shipments when picking up the Stolen Shipments.

j.  Defendant directed Conspirator 1 and drivers for Entity 1 to conceal packing slips and other information about the true origin of the Stolen Shipments when delivering the Stolen Shipments to the buyers.

k.  Contrary to his representations, Defendant never intended to pay for the Stolen Shipments, and stopped responding to the victim sellers and the victim logistics companies after obtaining the Stolen Shipments, or substantial portions of the Stolen Shipments. Neither Defendant nor Entity 1 ever paid for the Stolen Shipments or for the logistics services received.

l.  Defendant sometimes ordered more Stolen Shipments than he received and resold. For those Stolen Shipments that had been shipped to victim logistics companies but

4

not received by Defendant, when Defendant stopped responding to the victim sellers, victim sellers then bore the cost of finding and shipping those polymers to new buyers, often at a loss.

## Acts in Furtherance of the Scheme

10. The acts caused by Defendant in furtherance of the scheme, in the Northern District of Ohio, Eastern Division, and elsewhere, included, but were not limited to, the following:

11. On or about June 27, 2013, Defendant, using a Fraudulent Account, contacted Victim Seller 1 and submitted a purchase order for polyethylene worth approximately $161,325.

12. In or around July 2013, Defendant, using a Fraudulent Account, contacted Victim Seller 2 to begin to arrange for purported purchases of polyethylene worth approximately $577,094.

13. In or around September 2013, Defendant exchanged text messages and emails with Conspirator 1 and Person 1 to plan for Person 1 to pick up a Stolen Shipment from Victim Seller 2 in or around Houston, Texas. Defendant repeatedly emphasized to Person 1 that the license plates on the truck should be removed or covered, and that he should not use his real name. Defendant stated that Person 1 should "take no chances" on the license plate being seen. Defendant also emphasized to both Conspirator 1 and Person 1 that the true destination for the Stolen Shipment should not appear on any paperwork when picking up the Stolen Shipment.

14. In or around October 2013, Defendant exchanged text messages and emails with Conspirator 1 and Person 1 to plan for Person 1 to pick up a second Stolen Shipment from Victim Seller 2 in or around Houston, Texas. When Person 1 informed Defendant that he was getting close to the pick-up point, Defendant instructed Person 1, "Same as before. No plates or names."

15. In or around November 2014, Defendant, using a Fraudulent Account, contacted Victim Seller 3 and submitted a purchase order for polyethylene worth approximately $148,200.

16. In or around December 2014, Defendant, using a Fraudulent Account, contacted a victim seller and arranged to purchase at least approximately 17 semi-trailer loads of polyethylene, worth approximately $556,920.

17. On or about January 29, 2015, Defendant exchanged text messages with Conspirator 1 and Person 1 to plan for Person 1 to pick up a Stolen Shipment in or around Houston, Texas. Defendant stated to Conspirator 1, "Still gotta be a plain truck & trailer just like last time." Conspirator 1 asked how many loads there would be. Defendant responded, "17 loads total."

18. On or about February 3, 2015, Defendant exchanged emails and text messages with Person 1 regarding the plans for Person 1 to pick up a Stolen Shipment in or around Houston, Texas. Defendant instructed Person 1 that they would do the first load on the afternoon of February 3, 2015, and "then at 9AM and 1PM daily until done." Defendant stated to Person 1, "Same as last time. Pull your license plates and no names anywhere." Defendant said Person 1 would have to show a driver's license, and asked Person 1 to email a picture of Person 1's license. Defendant received that picture and created a counterfeit driver's license, using a false name, and emailed it back to Person 1. Defendant then sent Person 1 a text message stating, "Study it so you know your name."

19. On or about February 4, 2015, Defendant exchanged text messages with Person 1 regarding the Stolen Shipment that Person 1 was picking up. Defendant asked Person 1, "Did security give you any trouble?" Person 1 responded, "No," and added, "Not thus far lol." Defendant responded, "If they didn't today, probably smooth sailing from here."

6

20. On or about February 13, 2015, Defendant exchanged text messages with Person 1 regarding the Stolen Shipment that Person 1 was picking up. Person 1 asked Defendant to confirm that there would be two loads on the following Monday, making a total of 18 loads, and Defendant confirmed. Defendant added, "After today there will be one and a half loads of material left. I am fine with leaving the half load if you just want to run one [load] on Monday and get out of town. If you wanna run the second load on Mon[day] that's fine too. I'll pay for the additional load. Either way is fine. Your call." Person 1 confirmed that Conspirator 1 decided to do "both" loads on Monday, February 16, 2015. Defendant responded, "Works for me!!"

21. On or about February 23, 2016, Defendant exchanged text messages and emails with Conspirator 1 to plan for a driver to pick up a Stolen Shipment. Defendant said he had work for Conspirator 1 and asked, "Got somebody as good as [Person 1]?" Conspirator 1 responded that he did, and sent Defendant an email with a scanned copy of Person 2's South Carolina driver's license.

22. On or about March 1, 2016, Defendant exchanged text messages with Conspirator 1. Conspirator 1 asked if there was "[a]ny word yet." Defendant responded, "Not yet. I'll know shortly cause I'm gonna fish or cut bait." Defendant later stated, "Cut bait bring him home. I'll get another set up very soon."

23. In or around April 2016, Defendant, using a Fraudulent Account, contacted Victim Seller 4 and arranged for purported purchases of polyethylene worth approximately $384,000.

24. On or about April 21, 2016, Defendant sent Conspirator 1 multiple emails. One email had the subject line "DL and pick up order" and two attachments. One attachment was a

7

scan of a purported South Carolina driver's license with the photograph of Person 2 and a false name and other biographical information. The other attachment was titled "Pickup Order," on the letterhead of a major manufacturer Defendant had been impersonating with a Fraudulent Account, with Victim Seller 4's information, and false information regarding the destination of the Stolen Shipment. Another email with the subject line "BOL's for the Shelbyville deliveries" had multiple attachments, each titled "Bill of Lading," and each listing Coral Polymers as the shipper and the true buyer that Defendant had arranged as the ship-to destination.

25. On or about April 25, 2016, Defendant exchanged text messages with Conspirator 1 and Person 2 to plan for Person 2 to pick up the Victim Seller 4 Stolen Shipment in or around Jeffersonville, Indiana. Person 2 asked Defendant for "the destination for the load to tell them [the false destination]." Defendant responded with an address in Louisville, Kentucky. In truth and in fact, Defendant was arranging for Person 2 to deliver the Stolen Shipment to a location in or around Shelbyville, Kentucky. Defendant sent identical messages to Conspirator 1 and Person 2 about delivering the Stolen Shipment to the true buyers, stating, "Don't let them get any packing slips!! They can't know where this stuff came from."

26. In or around March 2017, Defendant, using a Fraudulent Account, contacted Victim Seller 5 and submitted purchase orders for polyethylene worth approximately $478,800.

27. In or around April 2017, Defendant, using a Fraudulent Account, contacted Victim Seller 6 and submitted purchase orders for two railcars of polyethylene, worth approximately $281,525.

28. On or about April 20, 2017, Defendant exchanged text messages with Conspirator 1 to plan for Person 2 to pick up Stolen Shipments in the area of Charlotte, North Carolina. Defendant instructed Conspirator 1, "Remember no markings on truck. No license

plates, driver cannot show his license. I'll send you a dummy so he can use a copy," and added, "if they ask." Conspirator 1 confirmed, and Defendant stated, "Same as last time," and explained, "I'll email you the license. Print it out and give it to him. He should say he lost his wallet but only if they ask for it. I don't think they will."

29. On or about April 23, 2017, Defendant sent an email to Conspirator 1 with the subject line "DL" and an attachment. The attachment was a scan of a purported South Carolina driver's license with the photograph of Person 2 and a false name and other biographical information.

30. Between on or about April 23, 2017 and April 25, 2017, Defendant sent emails to Conspirator 1 attaching documents titled "Release Order," bearing the emblem of a major manufacturer Defendant had been impersonating with a Fraudulent Account, concerning Stolen Shipments that had been shipped by rail from a company in or around Houston, Texas, to be picked up in the area of Charlotte, North Carolina.

31. On or about April 24, 2017, Defendant exchanged text messages with Conspirator 1 about the Stolen Shipments Person 2 was picking up in the area of Charlotte, North Carolina, and plans for Person 2 to deliver truck loads to various locations in South Carolina, North Carolina, and New Jersey. Conspirator 1 stated that Person 2 would make deliveries in North Carolina and South Carolina "in between waiting on the other driver to get back," adding that the "plan is to do 15 plus load[s] by Friday and finish up Monday and Tues[day,] unless [the logistics company facility where the Stolen Shipment was being stored is] open on the weekend."

32. On or about May 11, 2017, Defendant exchanged text messages with Conspirator 1 about additional Stolen Shipments Person 2 would be picking up in the area of

Charlotte, North Carolina. Defendant stated that the "next 5 will be early next," to be delivered to the same locations in North Carolina and South Carolina.

33. On or about May 15, 2017, Defendant sent Conspirator 1 an email with the subject line "Pick up appts and releases" and a message that included dates, times, and release codes for Stolen Shipments to be picked up in the following days.

34. Between in or around September 2018 and October 2018, Defendant, using a Fraudulent Account, impersonating a major international manufacturer, contacted Victim Seller 7 and submitted purchase orders for polyethylene worth approximately $659,448.

35. On or about October 25, 2018, Defendant exchanged text messages with Conspirator 1 to plan for Entity 1 to pick up Stolen Shipments from Victim Seller 7 in the area of Spruce Pine, North Carolina. Defendant stated, "Here's the plan," and explained, "Same setup. One driver does pickups. No markings or license plate on truck." Defendant added, "Only difference is we can't cram all the loads into a week. They gotta stay spread out."

36. On or about October 31, 2018, Defendant exchanged text messages with Conspirator 1 to plan for Entity 1 to pick up Stolen Shipments from Victim Seller 7 in the area of Spruce Pine, North Carolina. Defendant indicated a driver's license should not be needed this time, and added, "If they ask, he should say his wallet was stolen. Then he should let us know and I'll talk the warehouse through it." Defendant reminded Conspirator 1, "Remember no license plates or identifying logos on the truck or the driver." Defendant also instructed Conspirator 1, "The warehouse will provide a BOL [bill of lading] but throw those away after pickup. I'll send you BOL's for deliveries." Regarding bills of lading Defendant was preparing, Defendant explained, "These are your deliveries. The PU [pick-up] people should never see these."

37. On or about October 31, 2018, Defendant sent Conspirator 1 a number of emails. One email had an attachment that was a document bearing the name and logo of the manufacturer Defendant was impersonating, and titled, "[Manufacturer] Transport Order." Victim Seller 7 was listed next to "Ordered from," and Victim Logistics Company 1 was listed next to "Ship to." Another email with the subject line "BOL's" had 15 attachments, each a bill of lading listing "Coral Polymers" as the shipper, and listing the true buyers Defendant had arranged as the recipients of the shipments.

38. In or around November 2018, Defendant, using a Fraudulent Account, impersonating a major international manufacturer, contacted Victim Logistics Company 1 and arranged for Victim Logistics Company 1 to provide logistics services worth approximately $37,070.19, in connection with the Victim Seller 7 Stolen Shipments.

39. Between in or around October 2019 and November 2019, Defendant, using a Fraudulent Account, impersonating a major manufacturer of consumer goods, using an email signature claiming the title "VP Strategic Sourcing" for the "Hair Care Division" of the manufacturer, contacted Victim Seller 8 and submitted purchase orders for polyethylene worth approximately $1,608,000 (at prices of between $0.66 and $0.69 per pound), to be delivered to Victim Logistics Company 2 in or around Streator, Illinois.

40. On or about October 2, 2019, Defendant sent an email to a sales representative for Victim Seller 8 attaching a purchase order for 800,000 pounds of polyethylene (calculated as four railcars at approximately 200,000 pounds of polyethylene per railcar). Defendant stated that he would send an order for additional railcars.

41. On or about October 21, 2019, Defendant sent an email to a sales representative for Victim Seller 8, attaching a purchase order for 400,000 pounds of polyethylene.

42. On or about November 8, 2019, Defendant sent an email to a sales representative for Victim Seller 8, stating that he would order additional polyethylene as follows: 2 railcars in December 2019, 4 railcars in January 2020, and 3 railcars in February 2020.

43. On or about November 12, 2019, Defendant sent an email to a sales representative for Victim Seller 8, attaching a purchase order for 400,000 pounds of polyethylene.

44. On or about November 17, 2019, Defendant sent an email to a sales representative for Victim Seller 8, attaching a purchase order for 800,000 pounds of polyethylene.

45. In or around November 2019, Defendant, using a Fraudulent Account, impersonating a major manufacturer of consumer goods, contacted Victim Logistics Company 2 and arranged for Victim Logistics Company 2 to provide logistics services worth approximately $50,346.42, in connection with the Victim Seller 8 Stolen Shipments delivered between November 2019 and January 2020.

46. On or about November 21, 2019, Defendant exchanged text messages with Conspirator 1 to plan for Person 2 to pick up some of the Victim 8 Stolen Shipments from Victim Logistics Company 2 in or around Streator, Illinois. Defendant instructed, "tell him to take label off," and added that was "a must." Defendant later stated, "WTF [Entity 1] is listed on their BOL?? How did that happen?"

47. On or about December 23, 2019, Defendant sent Conspirator 1 an email, attaching four bills of lading listing "Coral Polymers" as the shipper, and listing the true buyers Defendant had arranged as the recipients of the shipments.

48. On or about December 26, 2019, Defendant exchanged text messages with Conspirator 1 regarding the plans for Person 2 to pick up some of the Victim 8 Stolen Shipments

and deliver them to the true buyers. Defendant stated, "Make sure he takes the labels off for the Chicago loads!! Critical!!"

49. On or about December 30, 2019, Defendant, using a Fraudulent Account, sent an email to Victim Logistics Company 2 stating that he would return to the United States on January 14, 2020, referring to a purported trip to China, and that, "later that week," he would visit Victim Logistics Company 2 to introduce himself "and drop off a check."

50. Between on or about January 16, 2020 and January 22, 2020, Defendant, using a Fraudulent Account, exchanged emails with a sales representative for Victim Seller 8. On or about January 16, 2020, Defendant falsely stated that he "came down with the flu and wasn't allowed to leave [China]" in order to return to the United States, but would soon be back. On or about January 21, 2020, the sales representative followed up, saying she hoped Defendant was "feeling better," asking if he had "made it back to the US," and stating that Victim Seller 8 management "does not want to hold your material considering your extenuating circumstances, so your 4 R/C's [the final four railcars from Defendant's November 17, 2019, fraudulent purchase order] were released on credit hold in good faith," and informing Defendant the price had increased to $0.70 per pound. Defendant responded on or about January 22, 2020, stating, "Unfortunately, I've been diagnosed with the Coronavirus," referring to the SARS-CoV-2 virus that caused COVID-19. Defendant continued, saying he had a "mild case" but was "stuck [in China] until cleared medically," and saying he would wire the money the following week. In truth and in fact, Defendant had not traveled to China and had not contracted the SARS-CoV-2 virus.

51. On or about January 24, 2020, Defendant, using a Fraudulent Account, sent an email to Victim Logistics Company 2 in response to requests for payment of a then-pending balance due of $33,453.80, stating, "I got stuck in China due to this virus outbreak."

52. Between in or around November 2019 and January 2020, Defendant, through Entity 1, received and sold six railcars of Stolen Shipments, or approximately half of the approximately $1,608,000 in polyethylene Defendant had ordered from Victim Seller 8, before Victim Seller 8 realized Defendant was not paying for the shipments and that Defendant was impersonating the company he purported to represent.

### Execution of the Scheme

53. On or about each of the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant, for the purpose of executing the scheme and artifice to defraud described above, and attempting to do so, as described below, transmitted, and caused to be transmitted, writings, signs, signals, pictures and sounds by means of wire communications in interstate commerce, to wit: the following emails from a Fraudulent Address purporting to be a fictitious employee of a major manufacturer of consumer goods, to a Victim Seller 8 sales representative, each one being sent from the State of Florida and routed through Victim Seller 8's email servers in the Northern District of Ohio, Eastern Division, each transmission constituting a separate count of this Information:

| Count | Approximate Date | Description of Transmission |
|---|---|---|
| 1 | October 2, 2019 | Defendant attached a purchase order for 800,000 pounds of polyethylene and stated he would send an order for additional railcars. |
| 2 | October 21, 2019 | Defendant attached a purchase order for 400,000 pounds of polyethylene. |
| 3 | November 8, 2019 | Defendant stated that he would order additional polyethylene as follows: 2 railcars in December 2019, 4 railcars in January 2020, and 3 railcars in February 2020. |
| 4 | November 12, 2019 | Defendant attached a purchase order for 400,000 pounds of polyethylene. |
| 5 | November 17, 2019 | Defendant attached a purchase order for 800,000 pounds of polyethylene. |

All in violation of Title 18, United States Code, Section 1343.

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By: ROBERT E. BULFORD
Chief, Criminal Division